Thomas McCLAIN, et al., Plaintiffs,

v.

LUFKIN INDUSTRIES, INC., Defendant.

No. 9:97–CV–0063.

United States District Court,
E.D. Texas,
Lufkin Division.

March 31, 1999.

Timothy Borne Garrigan, Stuckey & Garrigan, Nacogdoches, TX, for plaintiff.

John H. Smither, Christopher V. Bacon, Vinson & Elkins, Houston, TX, for defendant.

### MEMORANDUM OPINION

COBB, District Judge.

### INTRODUCTION

Sylvester McClain and Buford Thomas brought claims against Lufkin Industries [Lufkin] under Title VII and 42 U.S.C. § 1981 on behalf of themselves and a class of similarly situated persons. Mr. McClain filed a timely charge of employment discrimination with the EEOC and received his right to sue letter on or about December 4, 1996.[1] The issue now before the court is Plaintiffs' motion for class certification.

The law on this topic is complex and convoluted, and unfortunately the parties may view this opinion in a similar light. In the interest of intelligibility, we shall begin with a map of where we are going. The analysis is divided into two major sections: (i) Plaintiffs' prima facie case of disparate impact and (ii) Plaintiffs' satisfaction of Rule 23 criteria for certification as a class action.

---

1. Additional class members may "piggy back" on Mr. McClain's exhaustion of administrative remedies. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975).

### i. Plaintiffs' Prima Facie Case

There are two elements to establishing a prima facie case for disparate impact. First one must identify the employment practices which have a disparate effect. Second, it must be demonstrated that the identified practice does in fact have a distinct effect on one race. This is typically accomplished through statistical analysis. To support a disparate impact claim, the statistics must evaluate the pertinent sample set and they must reveal a gross disparity in how the identified practice impacts different races.

### ii. Criteria for Class Certification

There are five elements necessary to qualify a class for certification. The class must meet all four of the requirements of Rule 23(a) and one of the three possibilities under 23(b). The 23(a) requirements are as follows: Numerosity (the class must be so numerous as to make joinder of all plaintiffs impracticable); Commonality (the class must share common issues of law and fact); Typicality (the claims of class members must center on common legal and remedial theories); and Adequacy of Representation( the class representatives must act in the interest of the class and be free of any conflicting interests).

Rule 23(b) has three parts; 23(b)(2) will be discussed here. This criterion requires that the predominant form of relief sought by the class be injunctive. Monetary relief is allowed only incidentally.

### ESTABLISHING A PRIMA FACIE CASE OF DISPARATE IMPACT DISCRIMINATION

McClain alleges that Lufkin Industries' employment practices have a disparate impact on African–Americans. To support their motion for class certification, Plaintiffs seek to establish a prima facie case of employment discrimination in violation of Title VII and 42 U.S.C. § 1981. The elements of both claims are identical. *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277 (5th Cir.1994)

While the 5th Circuit acknowledges that "the discriminatory impact model of proof in an employment discrimination case is not ... the appropriate vehicle from which to launch a wide ranging attack on the cumulative effect of a company's employment practices." *Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 800 (5th Cir.1982), the Supreme court has since outlined the circumstances in which disparate impact analysis is appropriate to challenging pervasive discrimination in employment. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990, 108 S.Ct. 2777, 2786–87, 101 L.Ed.2d 827 (1988); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989). These general standards have been further elaborated by the Fifth Circuit. *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277 (5th Cir.1994)

Plaintiffs may base a disparate impact claim on subjective employment procedures. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990, 108 S.Ct. 2777, 2786–87, 101 L.Ed.2d 827 (1988). To establish a prima facie case Plaintiffs must identify the causes of the disparate impact and demonstrate their effects. First, they must identify the employment practices which allegedly have an adverse effect on the plaintiffs. Second, they must present statistics drawn from the relevant population that demonstrate that the challenged practices have a significantly different and adverse effect on the class members.

### IDENTIFICATION OF EMPLOYMENT PRACTICES

Title VII explicitly addresses the standard for identifying employment practices in disparate impact claims:

"With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decision making process are not capable of separation for analysis, the decision making process may be analyzed as one employment practice."

42 U.S.C. § 2000e–2(k)(1)(B)(i)

This clause was drafted in response to the Supreme Court's holding in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989). It encodes the Court's requirement that employment practices be identified with specificity, while also allowing for broad-based challenges where such specificity is not possible.

Our analysis begins by noting the norm of subjective decision making in Lufkin's system of management. We then enumerate the employment practices shown to be suspect. After elaborating on the various components of Lufkin's system of administration we will discuss why this system must be treated as one employment practice.

A broad array of Lufkin employment practices rest on the subjective decision making processes. Paul Perez, the Vice-president for Human Resources, testified that Lufkin Industries exercises subjective discretion in hiring, promotion, termination, discipline and demotion decisions throughout the company. This subjective decision making occurs both in central administration and within each division of the company.

■ Plaintiffs have alleged that Lufkin's subjective system of hiring disadvantages African–Americans. Discretionary authority over employment decisions without reference to objective guidelines can support a disparate impact claim. *Carpenter v. Stephen F. Austin State University,* 706 F.2d 608, 614 (5th Cir.1983). Most Lufkin employees are hired through the human resources department after being referred to Lufkin Industries from the Texas Workforce Commission. The referred applicants generally satisfy Lufkin's objective minimum criteria for entry-level employees. The next stage of the application process requires being approved by one of three white male employees whose discretion is not girded by any objective standards.[2] This sort of unfettered discretion is traditionally suspect.

■ Plaintiffs have alleged that Lufkin's subjective promotion system disadvantages African–Americans. Plaintiffs have also alleged that the subjective system of assigning job classifications to employees disadvantages African–Americans. Allocating employment opportunities according to subjective traits can function as a discriminatory employment practice. *Hill v. Mississippi State Employment Service,* 918 F.2d 1233, 1240 (5th Cir.1990). The human resources department at Lufkin directs each applicant to one of the several divisions within the company where the decision to hire is made. Plaintiffs assert (and their statistics support), that African–Americans are over represented in difficult and unpleasant jobs, and under represented in less strenuous positions. This channeling process is not guided by any objective standards or procedures of reviewing them.

Unfettered discretionary authority applied to promotions also supports claims of disparate impact. *Carpenter v. Stephen F. Austin State University,* 706 F.2d 608, 614. See also *Payne v. Travenol Laboratories, Inc.,* 673 F.2d 798, (5th Cir.1982) (holding that reliance on recommendations of supervisors in making promotions had discriminatory effect). The Fifth Circuit "has recognized that promotion systems utilizing subjective evaluations by all white supervisors provide a ready mechanism for discrimination." *Fisher v. Procter & Gamble Manufacturing Co.,* 613 F.2d 527, 544 (5th Cir.1980). All promotions between hourly positions are, in form at least, supposed to be governed by the collective bargaining agreements and ought to be determined by seniority.

While the defendants produced witnesses from management who stated that all available promotions were undeniably posted in the various departments, many of plaintiffs witnesses testified to the contrary. Some

---

2. We note here that discretion exercised by supervisors is not sufficient to infer discrimination. Plaintiffs must still proffer some statistical showing as to whether or not this system of subjective decision making has in fact disparately impacted African–Americans. We also note that while difference in race does not indicate per se discrimination, neither does commonality of race preclude discrimination. *See Hill v. Mississippi State Employment Service,* 918 F.2d 1233, 1240 (5th Cir.1990) (decrying the fallacy that "blacks never discriminate against other blacks.") *citing Castaneda v. Partida,* 430 U.S. 482, 513, 97 S.Ct. 1272, 1289, 51 L.Ed.2d 498 (1977).

witnesses even testified that the so-called postings were made after the de facto promotion decision had been subjectively made within that particular department.

From the testimony offered to the court, an exception for "skilled" applicants all but obliterates the seniority rule. The seniority system is sidestepped by machine operators bringing in hand-picked successors who are trained informally and are thereby able to qualify as a "skilled" applicant. The applicant with seniority is given a two-week window to display comparable competence. There are no standards for performance or structured opportunities for aspiring applicants to practice on the machines.

When white employees already dominate the more desirable jobs, the exploitation of the ability exception is likely to discourage African–Americans from pursuing advancement.[3] Training for advancement is informal, and thus the track to promotion is informal, which leaves the CBA a mere formality. The union grievance procedure has traditionally been ineffective and so it goes unused, leaving African–Americans effectively with no forum for their complaints. This is only one element in an interrelated web of factors that results in an employee's race altering his terms of employment.

The pervasive subjective decision-making process interacts with other facially neutral employment conditions to the disadvantage of African–Americans. The lack of transportable seniority under the CBAs falls more harshly on black employees who have been channeled into the Foundry or Trailer divisions.

"Black employees previously excluded from the higher paying departments because of their race will be denied ... promotion opportunities in favor of those white employees in the department; Secondly, those black workers, who, although deterred because of their race, have ob-

tained a foothold in a predominantly white department cannot compete equally on the basis of departmental seniority with white employees, who were able to gain entrance to the department earlier." *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir.1974)

Prior to the decision of Lufkin Industries' employees to become represented by two unions, the defendant had no portable seniority system between its various divisions. The two CBAs entered into between Lufkin's management and the two unions seem to have enshrined this practice. While this court cannot change the CBAs, it can at least consider the terms of those agreements as perpetuating this particular practice. At the most recent class certification hearing, a number of employees were asked whether they filed grievances under the CBAs when subjective decisions of management were made concerning promotions, demotions, layoffs and similar events. Some unsuccessfully filed grievances, others testified that it was useless to do so, if not detrimental to the continuation of their career goals at Lufkin Industries.

This is one example of multiple conditions of employment building on each other to result in a disparate impact. "Discrimination in hiring and advancement, even at the lower levels of the hierarchy, has a rippling effect upwards through that hierarchy." *McCuin v. Texas Power and Light Co.* 32 Fed. R.Serv.2d 1575, 1582 (E.D.Tex.1981). The absence of mobility, caused by subjective promotional standards, exacerbates the injury inflicted by the discriminatory channeling which results from the subjective initial job assignments. *See, e.g. Carpenter v. Stephen F. Austin State University*, 706 F.2d 608 (5th Cir.1983).

This ripple effect begins with the discretionary channeling of African Americans into the most difficult jobs, but it extends

---

**3.** Compare, *Payne v. Travenol Laboratories, Inc.*, 673 F.2d 798, 827 ("Even if applications were not required for certain positions, when most of the supervisors are white, failure to post job vacancies can only discourage applications by blacks to a greater degree than it discourages whites, who garner information through the grapevine.") and *Pettway v. American Cast Iron*

*Pipe Co.*, 494 F.2d 211 (5th Cir.1974) ("a black employee with knowledge of the nominal number of black foremen, the Company's past discriminatory policies, and the current practice of promotion via the recommendation of an incumbent foreman, could hardly be expected to make a meaningless request indicating his willingness to be promoted.")

throughout up to and including layoffs and rehiring.

"The process of lay-off and rehiring meant that any movement of black employees into traditional white jobs would come to an end. As lay-offs occurred, the employees with the least departmental seniority, e.g. the newly hired, promoted, or transferred black employees, would be either (1) furloughed, if newly hired, or (2) dropped back into the department from which they transferred, as they retained former departmental seniority in that department for lay-off purposes. FN11.

We note that in *Rowe v. G.M.C.*, 457 F.2d 348, 357–358 (5th Cir.1972), this court rejected this as an ameliorating variable justifying a seniority system which, during the 'ebb and flow' of lay-offs and rehiring, required black employees to once again 'go to the foot of the line.' " *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211 (5th Cir.1974)

Lufkin's subjective employment practices are inextricably intertwined. The disparate impacts begin on the day one is hired and are potentially magnified each time one's career is intersects a subjective decision-making process. Channeling in job placement is reinforced by informal systems of training and promotion. The seniority structure locks employees into their divisions. Layoffs and rehires function to keep African–Americans from advancing.

The discriminatory effects of the constellation of suspect employment practices used by Lufkin Industries cannot be isolated individually. The "elements of a respondent's decision-making process are not capable of separation for analysis, [and thus] the decision-making process may be analyzed as one employment practice." 42 U.S.C. § 2000e–2(k)(1)(B)(i) Plaintiffs have met their burden in identifying the employment practice resulting in the alleged disparate impact. We must now consider whether evidence can establish that a disparate impact in fact exists.

## STATISTICAL ANALYSIS

■■■ A prima facie case also requires Plaintiff to demonstrate that the challenged employment practices effect one race more harshly than the other. Plaintiffs ordinarily employ statistical analyses to make this showing. To support a claim of discrimination, statistical evidence must be based on relevant samples sets. For instance, when evaluating hiring practices, statistical evidence must analyze the qualified work force, rather than the population at large. Similarly, when examining promotion practices, the data must be based only on those qualified for promotion, not the workforce as a whole. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990, 108 S.Ct. 2777, 2786–87, 101 L.Ed.2d 827 (1988); *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277 (5th Cir.1994)

Plaintiffs have sought to substantiate their claims through statistical analysis conducted by Ms. Sandra McCune.[4] Ms. McCune both testified before the court in the hearing on class certification and prepared a report of her conclusions which has been admitted into evidence.

The McCune report analyzed hiring, job assignment, promotion, compensation, discharge for cause, and layoffs. McCune tested for racial bias in these practices by comparing the ratio between the races in the relevant group with the ratio between the races in the group benefitted or injured by the application of the employment practice. The employment data which the report analyzed consisted of computer data bases and bid sheets provided by Lufkin Industries to Plaintiff's counsel. Her report was based on the best evidence and most complete set of information available.

The first issue confronting the court is whether the McCune report compares the appropriate data sets. In analyzing hiring, the report compared the ratio of blacks to whites in the applicant pool with the ratio of blacks to whites in the group offered employ-

---

4. Ms. McCune is amply qualified to perform and testify on the topic of statistical analysis. She holds a doctorate from Texas A & M University with a support field in statistics and she is a member of the American Statistical Association, the Texas Academy of Science, and the Caucus for Women in Statistics. Furthermore, she has testified as an expert in statistics in various state and federal courts in Texas prior to her appearance before this court.

ment. To be probative of disparate impact the comparison should be between qualified applicants and hires.

According to the testimony of Paul Perez, Lufkin requires four minimal qualifications to be considered for entry-level hiring: no dismissal for cause in last 2 years, six months of continuous employment elsewhere, an employment record clear of discipline or absentee problems, and some experience in an industrial environment (broadly construed). A substantial majority of entry level applicants are referred to Lufkin Industries by the Texas Workforce Commission where prospective applicants are pre-screened for these hiring criteria.

As a result, all the applicants reflected in Lufkin's database presumably meet the minimum, objective criteria for employment at Lufkin. Whether or not an applicant is hired by Lufkin after being referred there by the TWC depends on how he fares in the subjective component of the hiring process. Thus statistical disparities between applicant rates reflected in this database and hiring rates are properly attributed to the subjective hiring process and are not caused by the objective job qualifications. The McCune report's analysis properly compares qualified applicants to hired individuals.

In analyzing promotion, the report compared the ratio of blacks to whites among hourly employees with the ratio of blacks to whites promoted from hourly to salaried positions. To be probative of disparate impact the comparison must be between the pool of individuals qualified for promotion and those individuals promoted.

There are no written job descriptions promulgated by Lufkin for use in applying for or allocating promotions. The collective bargaining agreement governs promotions within hourly positions and makes seniority the sole criteria. Even that single objective criteria can be overridden, and often is, by a subjective assessment of the skill of a less senior applicant. This subjective exception is further skewed because of discriminatory informal training. Most promotions relate to specialized tasks; insofar as one individual gains higher qualifications than another it is due to discriminatorily selective, informal, on-the-job training.

In the data analyzed in the McCune report, sign-up sheets indicate that employees across the spectrum of seniority and job classification regularly applied for promotions of all sorts. There appear to be no career ladders, either in theory or practice, which require that an employee work on rung seven to be promoted to rung eight. In absence of formal criteria for promotion, Lufkin Industries itself indicates that all applicants are minimally qualified for all positions. The McCune report in analyzing promotion rates properly compared the racial make-up of the promotion group to the racial make-up of the hourly work force as a whole.

The McCune report also analyzed the racial composition of different divisions, the compensation of both hourly and salaried employees, rates of discharge for cause, and rates of layoffs. These analyses all compare similarly situated groups of employees and do not require a close inquiry into the relevance of the underlying data. The court finds that the data underlying the McCune report was of sufficient reliability to support the report's conclusions. Having ascertained that the appropriate data sets were analyzed, we now turn to inquire whether the results of the analysis support a prima facie case of disparate impact.

■ There are no bright-line rules regarding what degree of statistical disparity is necessary to support a disparate impact claim. Traditionally, the statistics must show a "gross disparity" in how the different races are affected. *Lopez v. Laborers International*, 987 F.2d 1210, 1214 (5th Cir.1993); *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 190 (5th Cir.1983) (citing *Hazelwood School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)) A deviation greater than three standard deviations is sufficient to support a prima facie case. *Lopez*, 987 F.2d at 1214; *Williams v. New Orleans Steamship Ass'n*, 673 F.2d 742, 750 n. 13 (5th Cir.1982); *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977).

The McCune report found that in every evaluated employment practice, the allocation

of benefits and detriments deviated from what would be anticipated from random distribution among the races by discrepancies equal or exceeding three standard deviations. Each of these served to disproportionately disadvantage African–Americans. The report showed that with a legally cognizable statistical significance, African–Americans were less likely to be hired, more likely be fired, more likely to be laid off, more likely to be assigned to arduous positions, less likely to be promoted, and less likely to be compensated as much as white employees.

The court concludes that Plaintiffs have shown a prima facie case of disparate impact sufficient to support their motion for class action. Plaintiffs' showing is not dispositive on the issue of liability; it is merely sufficient to meet its burden to move forward with the suit certified as a class action. A more substantive showing may prove necessary to meet Plaintiffs burden at trial. At this stage of the proceedings the statistical showing is sufficient.

## SATISFYING THE ELEMENTS FOR CLASS CERTIFICATION

■ Rule 23 delineates prerequisites for proceeding with a class action. The class must first satisfy "four threshold requirements [outlined in Rule 23(a) ] ... (1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interest of the class')." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In addition, the class must satisfy one of the three subsections of Rule 23(b). Id. The party seeking class certification bears the burden of showing all of these criteria to be met. *See id. Castano v. American Tobacco Co.,* 84 F.3d 734 (1996).

Here Plaintiffs seek to be certified under Rule 23(b)(2). To succeed, Plaintiffs must demonstrate that in addition to the four elements required by 23(a), "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R.Ev. 23(b)(2). As the Court noted *Amchem,* "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of suits properly brought under 23(b)(2). *Amchem,* 521 U.S. 591, 117 S.Ct. 2231, 2245.

■ The four elements of 23(a) are threshold requirements. The numerosity analysis determines whether special procedural treatment is necessary for the case at hand. The remaining criteria ensure that the special procedures do not impair the interests of Plaintiffs not actually present in the suit. See generally, *Allison* at 413 (procedural safeguards function to protect Plaintiffs' interests). The purpose of the remaining criteria is to have the class represented by a named Plaintiff whose interests are consistent with those of the class. This standard does not require class and individual claims to correspond perfectly. In a suit under 23(b)(2) Plaintiffs need show neither identical claims nor the predominance of common claims over individual ones. *Allison v. Citgo,* 151 F.3d 402, 414 (1998). Rather, representative plaintiffs must show that they share the interests of those whom they seek to represent.

■ While a court should not certify a class lightly, neither should courts err to the side of refusing certification at the early stages of litigation. The opportunity to modify the certification or to de-certify entirely provide ample opportunity to restructure the suit as discovery develops. In this case the parties have submitted extensive documentation, offered testimony in two evidentiary hearings, and thoroughly briefed the issues before the court. Having carefully considered the evidence before it, the court concludes that the following class solidly satisfies all elements of 23(a) and 23(b)(2):

All Black persons employed for any period of time by defendant Lufkin Industries on or after March 6, 1994, to date, whose compensation, remuneration, benefits, job assignments, promotional opportunities,

career advancement and other terms and conditions of employment have been, may have been, or may become, adversely affected by defendant Lufkin Industries' past or present systems of administering hiring, wages, salaries, job assignments, training, evaluations, promotions, demotions, terminations, layoffs, recalls, and re-hires.

In accordance with the requirements of *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), the elements of Plaintiffs' claim to class certification will be discussed in detail. *Castano v. American Tobacco Co.,* 84 F.3d 734 (1996) We begin by noting that it is not appropriate at this time to examine the merits of the case. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176–78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). Class certification is a procedural determination and this opinion is limited to that issue. *Garcia v. Gloor,* 618 F.2d 264, (5th Cir.1980) rehearing denied 625 F.2d 1016, certiorari denied 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842.

## NUMEROSITY

There are no mechanical rules for determining sufficient class size; instead, the analysis must consider all the circumstances of action. *Watson v. Shell Oil,* 979 F.2d 1014, 1022 (1992); (citing *General Telephone v. EEOC,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980)). The central requirement is that the joinder of all prospective plaintiffs be impractical. FRCP 23(a)(1). In assessing the difficulty of joining all plaintiffs, the court may consider the number of plaintiffs, the difficulty of identifying them, their geographical diversity, and the nature of the action. *Bradford v. Sears, Roebuck & Co.,* 673 F.2d 792, 795 (1982); *Neff v. VIA Metropolitan Transit Authority,* 179 F.R.D. 185, 193 (W.D.Tex.1998).

Employment discrimination suits seeking injunctive relief are frequently managed as class actions due to distinctive difficulties with joinder. Prospective plaintiffs may refuse to identify themselves for fear of harassment or retaliation by the employer. See, Lindemann and Grossman, *Employment Discrimination Law* at 1607 (3d ed.1996) (citing cases). The prospective nature of injunctive relief often makes it epistemiologically impossible to identify which individuals may be impacted by the conduct at issue. See, *Bradford* at 795.

Suits for injunctive relief also call for class treatment due to the danger of inconsistent results if the suits were tried individually. Preventing piecemeal litigation is chief among the purposes of the class action format. *Baylor v. HUD,* 913 F.2d 223, 225 (5th Cir.1990).

The class definition approved by the court today includes all African–Americans that have been employed at Lufkin Industries for any length of time. Lufkin currently employs approximately 350 African–Americans. Lufkin has terminated in excess of 250 African–Americans in the time period covered by this suit. The court has not been provided with the number of African–Americans that left the employ of Lufkin voluntarily. However, the six-hundred-some readily identified potential plaintiffs argue, by their sheer numbers, against the practicability of joinder.

The circumstances surrounding the suit also indicate difficulties with joinder. Plaintiffs have submitted and prevailed in one motion for relief from retaliation and submitted anonymous affidavits of prospective class members who fear retaliation from being named in a lawsuit against Lufkin Industries. Even if every potential plaintiff could be identified, some would resist being named in this suit for fear of the consequences.

The nature of the action makes individual suits undesirable and joinder impracticable. The primary relief sought in this action is injunctive. Injunctive orders issued in a series of individual suits would be potential nightmare of untangling inconsistent results and res judicata. The equitable nature of the suit also makes joinder impossible. The class includes individuals that may be adversely affected by Lufkin's practices in the future, and as such are incapable of being identified or joined in the suit.

## NEXUS REQUIREMENT

The elements of typicality, commonality, and adequacy of representation required by 23(a) tend to overlap and intertwine. *Amchem*, 521 U.S. 591, 117 S.Ct. 2231, 2251 (1997). They are collectively referred to as the "nexus requirement" of similarity between individual and shared claims. *Bradford v. Sears and Roebuck*, 673 F.2d 792. The commonality analysis centers around the similarity of facts on which the claims rest. The typicality analysis tends to focus on the similarity of legal and remedial theories. The adequate representation criteria requires that the absent plaintiffs be represented zealously by representatives who are free of interests conflicting with those of the class.

While we discuss each element separately, each discussion of each element is relevant to the satisfaction of the others. We begin our analysis of the nexus between the class and representative Plaintiffs' claims by noting that the standard for demonstrating commonality and typicality is not high, *Lightbourn v. County of El Paso*, 118 F.3d 421, 426. And that a district court certainly may look past the pleadings to determine whether the requirements of rule 23 have been met. *Castano*, 84 F.3d 734 (1996)

## COMMONALITY

Rule 23(a)(2) requires that there be "question of law or fact common to the class." There must be at least one issue whose resolution will affect all or a significant number of the putative class members. *Lightbourn*, 118 F.3d 421. In determining whether common issues of fact are present, the analysis set forth in *Harriss v. Pan American World Airways, Inc.*, 74 F.R.D. 24, 41 (N.D.Cal.1977) and approved by Bradford is illuminating:

> "In the context of litigation over alleged unlawful employment practices, relevant criteria of commonality include the following:
>
> i. (i) What is the nature of the unlawful employment practice charged-is it one that peculiarly affects only one or a few employees or is it genuinely one having a class-wide impact [?]
>
> ii. (ii) How uniform or diverse are the relevant employment practices of the employer, considering matters such as: size of the work force; number of plants and installations involved; extent of diversity of employment conditions, occupations and work activities; degree of geographic dispersion of the employees and of intra-company employee transfers and interchanges; degree of decentralization of administration and supervision as opposed to the degree of local autonomy [?]
>
> iii. (iii) How uniform or diverse is the membership of the class, in terms of the likelihood that the members' treatment will involve common questions[?]
>
> iv. (iv) What is the nature of the employer's management organization as it relates to the degree of centralization and uniformity of relevant employment and personnel policies and practices [?]
>
> v. (v) What is the length of the time span covered by the allegations, as it relates to the degree of probability that similar conditions prevailed throughout the period [?] (Footnote omitted.)" *Bradford v. Sears*, 673 F.2d 792, 796.

Each criteria and how this class satisfies it will be discussed below.

The first indicia of commonality is that the employment practices challenged by the suit are by nature widespread in their impact. Here Plaintiffs have made a prima facie case of disparate impact via subjective employment practices. "Allegations of similar discriminatory employment practices, such as the use of entirely subjective personnel processes that operate to discriminate, satisfy the commonality and typicality requirements of Rule 23(a). *Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 617 (5th Cir.1983)." *Shipes v. Trinity Indus.*, 987 F.2d 311, 316; See also *Lightbourn*, 118 F.3d 421, 426. While we do not here address whether Plaintiffs will prevail in their claim, their allegations and the evidence before the court outline a network of employ-

ment practices that potentially impacts every African–American employed at Lufkin Industries.

The second indicia of commonality concerns the homogeneity of the employment practices being challenged. Inquiries into the size of the workforce, number of plants, variety of employment conditions, geographic location, and the degree of local autonomy attempt to assess the likelihood of a class of employees being similarly impacted by the challenged employment practices.

Lufkin Industries' total workforce in 1997 was 1,856. African–American employees numbered 289. The company has five divisions: Foundry, Oil Field, Power Transmission, Trailer, and Administration. Over ninety-five percent of employees work in the four production divisions of the company. All employees except for sales and oil field maintenance workers are located in one industrial complex in Lufkin, Texas. The home office in Lufkin controlled hiring and staffing decisions for remote sales and maintenance offices. All entry level employees at the Lufkin plant are filtered through the central Human Resources Department. Wages, salaries and divisional assignments are determined centrally. Training, evaluation, promotion, demotion, termination, layoffs, recalls and rehires are determined by a subjective decision making process.

All challenged employment practices are either centrally controlled or proceed in parallel in the various divisions. The workforce is neither so large, nor so geographically diffuse, to attenuate the influence of policies and practices made by the Human Resources office. Significant responsibility resides in departmental decision making. However, this discretion is the precise target of the disparate impact claim. Lufkin Industries is structured and administrated in such a fashion that the challenged employment practices are likely to affect all class members similarly.

The third indicia of commonality addresses the homogeneity of the class itself. Class members must be similarly situated with respect to the employment practices under review. Race-based disparate impact claims necessarily imply a class consisting of plaintiffs with common questions of fact. The class here defined does not encompass multiple ethnicities, or address claims based on gender, age, etc. Just as the challenged policies were of general applicability, the basis of the alleged discrimination was uniformly shared by the members of the class, i.e. *their race*.

The fourth indicia of commonality concerns the centralization of the employer's management organization with respect to the challenged employment policies. As was discussed above, the suspect employment practices were either centrally controlled or proceeded along parallel tracks in the different divisions. Those divisions did not exercise their discretion by adopting dissimilar objective criteria, rather they all practice a subjective decision-making process—precisely the employment procedure being challenged.

The fifth indicia of commonality relates to the time frame of the claimed discrimination. The issue is the likelihood of employment practices remaining consistent throughout the period of the alleged discrimination. The class here is limited to those who can show injury since March 6, 1994. The court finds that employment conditions and practices have been substantially the same over the last five years.

The court finds ample evidence indicating a commonality of question of facts and law among the members of the proposed class. Our analysis pursuant to the *Pan–Am* standard has illustrated a wide base of common factual questions. The typicality analysis below outlines similarly shared legal issues.

## TYPICALITY

 The typicality prong of the nexus requirement centers on the similarity of legal and remedial theories. *Lightbourn*, 118 F.3d at 426. Typicality is met where "[i]n the event the class members in this case were to proceed in a parallel action, they would advance legal and remedial theories similar, if not identical, to those advanced by the named plaintiffs." *Lightbourn*, 118 F.3d at 426. Allegations of a subjective personnel process that operates in a discriminatory way generally satisfies the typicality requirement

of Rule 23(a). *Shipes,* 987 F.2d at 316; See also *Lightbourn,* 118 F.3d at 426.

The named Plaintiffs have alleged that they have been disadvantaged by their race in terms of job assignments, advancement, training, transfer, compensation, conditions of employment, lay-offs, rehires, and demotion while employed at Lufkin Industries. They have brought claims for injunctive relief under Title VII and 42 U.S.C. § 1981.

The court took almost three days of testimony from more than ten class representatives and potential class members. This testimony indicated patterns of discrimination resulting from subjective employment practices. Witnesses offered similar accounts of the discriminatory impact of Lufkin's employment practices and often set their experience in a context of similar discrimination suffered by fellow African–American employees.

The discussion concerning Plaintiffs' prima facie case elaborated at length the elements necessary to make a claim of discrimination due to the disparate impact of subjective employment procedures. Any class member bringing suit independently would have to allege the same elements for their cause of action that the representative Plaintiffs have here. The legal claims made by the representative Plaintiffs are not idiosyncratic; they are typical of the claim available to all class members.

## ADEQUACY OF REPRESENTATION

■■■■ The adequacy of representation requirement serves two functions. Like the commonality and typicality requirements, it assures that shared interests between the representative plaintiffs and the class as a whole are present, but it also functions to insure the absence of conflicts. *Amchem,* 521 U.S. 591, 117 S.Ct. 2231. To serve as representatives, named plaintiffs must have common interests with class members, a lack of interests adverse to class members, and must vigorously prosecute the interests of the class through qualified counsel. *East Texas Motor Freight System Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). This standard requires similarity, not identity, of interests. *Carpen-*

*ter v. Stephen F. Austin State University,* 706 F.2d 608 (5th Cir.1983).

■■■ The requirement of common interests with the class does not preclude unique interests, only adverse interests. The testimony of proposed class representatives, both live and by affidavit, establishes an extensive core of common interests that they share with the proposed class. While the experience of each individuals will likely be unique, there is no foundation to infer adversity from diversity. The evidence offered by Plaintiffs amply demonstrates that the experience of each individual class representative takes its form from a generally applicable system of employment practices.

Lufkin argues at length against the adequacy of Sylvester McClain and Buford Thomas as class representatives. The court disagrees. The differences cited by defendant do not go to plaintiffs' suitability or capacity to manage this action. We find that the interests of the set of representative plaintiffs are common to and consistent with those of the class with respect to the litigation and resolution of this law suit.

In addition the court has on file affidavits from seven additional class members who express their willingness to serve as class representatives. In the class certification hearing multiple witnesses also agreed, if called upon, to serve in that capacity. The court is firmly convinced that adequate class representatives are both present in the suit and available to serve. The court has continuing authority and ongoing obligation to adjust the class to serve the interests of the class members. Should the appointment of additional class representatives benefit the class, the court will move to do so.

Both the representative Plaintiffs and Plaintiffs' counsel have demonstrated their willingness, capacity, and dedication to pursuing these claims. Mr. McClain and Mr. Thomas have attended each court appearance involving this suit. Multiple potential class members testified in the class action hearing testified and via affidavit to their confidence in Thomas and McClain as class representatives. Counsel for the Plaintiffs are known to this court as trial lawyers

experienced in employment law, civil rights actions, and complex litigation. Counsel have documented their qualifications through documents submitted to the court recounting the breadth of their experience in these areas of the law. Finally, class counsel have pursued this suit and related issues with an unmistakable zeal.

The court finds that representative Plaintiffs and class counsel are adequate to the task of litigating this lawsuit. The court further finds that the proposed class satisfies the requirements of numerosity, typicality, and commonality. The court is firmly persuaded from careful consideration of the evidence adduced at the class certification hearing that Plaintiffs have met their burden with respect to the elements required by Rule 23(a).

## RULE 23(b)(2)

Having satisfied the requirements of 23(a), Plaintiffs must also satisfy one of the three subsections of Rule 23(b) to qualify for class certification. *Amchem,* 521 U.S. 591, 117 S.Ct. 2231, 2245. In this instance, Plaintiffs seek to be certified under Rule 23(b)(2). This provision requires a showing that, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Evid. 23(b)(2). Civil rights cases alleging class-based discrimination are classic examples of suits suitable for certification under 23(b)(2). *Amchem,* 521 U.S. 591, 117 S.Ct. 2231, 2245

For a class to be certified under 23(b)(2) the claims for injunctive relief must predominate. *Allison v. Citgo,* 151 F.3d 402 (1998). This requirement does allow for some forms of monetary relief, so long as this is not the predominant form of relief. *Allison v. Citgo,* 151 F.3d 402 (1998). "Monetary relief 'predominates' under Rule 23(b)(2) . . . when the monetary relief being sought is less of a group remedy and instead depends more on the varying circumstances and merits of each potential class member's case." *Allison v. Citgo,* 151 F.3d 402 (1998).

Allison held that class-wide claims for compensatory and punitive damages are inconsistent with the structure of 23(b)(2) classes. Here, however, Plaintiffs seek compensation and punitive damages individually and not as representatives of the class. "The district courts, in the exercise of their discretion, are in the best position to assess whether a monetary remedy is sufficiently incidental to a claim for injunctive or declaratory relief to be appropriate in a(b)(2) class action." *Allison v. Citgo,* 151 F.3d 402 (1998)

Inspired by Alexander's answer to the Gordian Knot, the court here resolves any conflict between the alternate remedies by severing Plaintiffs' claims for monetary relief from class claims for injunctive relief. This done, injunctive relief unquestionably predominates; this class is suitable for certification pursuant 23(b)(2).

## CONCLUSION

After careful review of the copious evidence presented by both sides of the dispute, the court is persuaded that the proposed class satisfies all requirements for certification. The Plaintiffs' motion for certification of the class is therefore granted.