Matthews SMITH, et al., Plaintiffs,

v.

TEXACO, INC., et al., Defendants.

No. 1:96–CV–749.

United States District Court,
E.D. Texas,
Beaumont Division.

March 7, 2000.

---

James Erick Payne, Provost & Umphrey, Beaumont, TX, Reuben A. Guttman, Brian P. McCafferty, Charles V. Firth, Provost & Umphrey, Washington, DC, for plaintiffs.

J. Courtney Wilson, Scheuermann & Jones, New Orleans, LA, for intervenor–plaintiffs.

Stephen F. Fink and David M. Pryor, Thompson & Knight, Dallas, TX, Mike McQueeney and Joseph P. Moan, Texaco Group Inc., Paul W. Gertz, Germer & Gertz, Beaumont, TX, for defendants Texaco, Inc., Texaco Refining & Marketing, Inc., and Texas Refining nad Marketing Inc. (East).

Victor Scott Kneese, Bracewell & Patterson, Houston, TX, Robert J. Hambright, Orgain, Bell & Tucker, Beaumont, TX, for defendant Star Enterprise.

Neil Martin, Robert Ellison Meadows, Nancy J. Brown, Gardere Wynne Sewell & Riggs, Houston, TX, for Aramco Services Co.

Dewey J. Gonsoulin, Mehaffy & Weber, Beaumont, TX, for defendant Saudi Refining.

John Michael Dorman, Locke, Liddell & Sapp, Houston, TX, for defendant Shell Oil Co.

## MEMORANDUM OPINION

COBB, District Judge.

### I. BACKGROUND

This is a racial discrimination case, brought by six named plaintiffs on behalf of a class of approximately 200 salaried African–American persons employed by Star Enterprise [Star] between 1991 and the present time. The plaintiffs allege that Star subjects the class to systems and practices that discriminate against African–Americans in promotion, compensation and opportunities for career advancement. These practices allegedly apply company-wide throughout the United States, in its six locations in Port Arthur, Texas; Convent, Louisiana; Delaware City, Delaware; Houston, Texas; Atlanta, Georgia; and Richmond, Virginia.

Star is a joint venture formed in 1989 under New York partnership law by the defendants Texaco Refining and Marketing East, Inc. [TRMI East] and Saudi Refining, Inc. [Saudi]. Under the terms of the joint venture, Star is governed by a six-member management committee. Three of the members of the committee are appointed by TRMI East and three are appointed by Saudi. The joint venture

agreement provides that decisions concerning Star's management and control require a majority vote of the management committee.

This relationship with Texaco is a significant issue in this lawsuit. In 1994, a class of Texaco employees sued their employer for violations of Section 1981 of the Civil Rights Act of 1971 and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*) [Title VII]. *See generally Roberts v. Texaco, Inc.*, 979 F.Supp. 185 (S.D.N.Y.1997). That case received national attention because during its pendency senior Texaco officials, some of whom were on the management committee of Star, were taped allegedly making racially insensitive comments. *Id.* at 189–192; *see, e.g.,* Frankel, *Tale of the Tapes,* THE AMERICAN LAWYER 65 (March 1997); Eichenwald, *Texaco Executives, On Tape, Discussed an Impending Bias Suit,* THE NEW YORK TIMES, November 4, 1996; Eichenwald, *Investigation Finds no Evidence of Slur on Texaco Tapes,* THE NEW YORK TIMES, November 11, 1996.

The plaintiffs in this case claim they believed they would be part of the *Roberts* class action. However, it was later learned the Star employees would not be part of the settlement the Texaco employees received from Texaco when the judge in *Roberts* certified a settlement class only. The Star employees then filed this suit alleging that discriminatory practices and policies determine promotions, advancement opportunities and compensation at Star.

The plaintiffs' complaint centers around two specific practices. First, the plaintiffs allege that the defendants use "facially-neutral" decision making systems, which in their application, have a disproportionate, adverse impact on African–Americans. *See* 42 U.S.C. § 2000e–2(k)(1)(A)(i). Second, the plaintiffs claim that despite the facial neutrality of these practices, they are not applied uniformly or consistently and are entirely subjective. These practices include: (1) Star's Performance Management Program [PMP] evaluation sys-

tem-a system Star uses to evaluate all of its salaried employees and which affects employees' compensation and opportunities for advancement and development; (2) Star's Job Posting Program or lack thereof; and (3) Star's compensation/pay-grade system.

Plaintiffs conclude that by using these discriminatory practices and policies, the defendants have engaged in a pattern and practice of intentional discrimination against the class in violation of the Civil Rights Act of 1871, as amended in 1991, 42 U.S.C. § 1981 [Section 1981], and Title VII.

## A. Parties to the Suit

There are multiple defendants in this case due to the corporate complexities of these defendants. Besides Star, TRMI (East), and Saudi, the plaintiffs have also named Aramco Services Company [ASC], Texaco Refining & Marketing, Inc. [TRMI], Texaco and Shell Oil Co. as defendants.

Since Saudi and TRMI (East) are equal partners in Star, they are liable for Star's actions. *See generally* N.Y. PARTNERSHIP LAW (McKinney 1997). ASC and TRMI are signatories to the joint venture agreement which established Star. They therefore share potential liability with their wholly owned subsidiaries' joint venturers, SRI and TRMI (East). TRMI (East) is a wholly owned subsidiary of TRMI, which is in turn, a wholly owned subsidiary of Texaco Inc., Texaco controls TRMI and TRMI controls TRMI (East). Plaintiffs allege that TRMI (East) serves as the agent of both TRMI and Texaco. Saudi is a wholly owned subsidiary of ASC. Plaintiffs allege that ASC controls Saudi and that Saudi serves as ASC's agent.

Plaintiffs have alleged that Star's racially discriminatory policies originated with Texaco. Texaco has the power to control Star's employment practices through its indirect 50% ownership of Star. It is also alleged that Texaco uses Star as a training ground for Texaco employees and that

most of Star's assets came from Texaco. Thus, the plaintiffs conclude that the Texaco entities (Texaco, TRMI and TRMI (East)) are liable for the actions of Star since it acts as an agent or representative of the Texaco entities.

Throughout the various hearings and motions in this case, it has become very clear that there is a seamless transfer of employees and records between Star and Texaco. *See, e.g.,* Memorandum Opinion on TRO, Jan. 2, 1997 [doc # 26]. Texaco shares all employee performance and appraisal records with Star to determine seniority when employees choose to switch employment from Star to Texaco or vice versa. According to testimony at the class certification hearing, this occurs with some regularity, but not necessarily on a scheduled basis.

Moreover, almost all of the plaintiffs in this case began their employment with Texaco or one of its various subsidiaries. In 1989, when Star was formed many of them were merely "reassigned" from Texaco to Star. Thus, it is quite possible that the plaintiffs will be able to establish that Star acts as an agent for Texaco and its subsidiaries.

Finally, when this case was originally filed it appeared that Star would be dissolved and its assets transferred to three new partnerships. *See Marketing, refining pact signed/Texaco, Aramco, Shell teaming up,* HOUSTON CHRONICLE, May 28, 1998 (describing the potential deal). The three new partnerships were to be each co-owned by Saudi, Shell and Texaco. The name of this new entity is Motiva. These defendants would be liable as successors in interests if plaintiffs claims prove to be true.

## B. The Class Allegations

As stated earlier, the plaintiffs allege that the defendants have engaged in a pattern and practice of racial discrimination in employment. The plaintiffs claim, among other things, that the defendants have discriminated against qualified African–American employees in the following ways: (1) denying those employees the opportunity for promotion and refusing to promote qualified African–Americans; (2) denying those employees comparable salaries, raises and other compensation given to Caucasian employees; (3) concealing information from African–American employees about promotion opportunities and available positions in other departments within the companies; (4) misrepresenting facts to African–American employees regarding the availability of promotions and certain positions; (5) not allowing African–Americans to acquire the experience, opportunities and training necessary to obtain the qualifications to be promoted; and (6) retaliating against employees who assert their civil rights through intimidation, diminishment of work responsibilities, and termination of employment. (Plaintiffs' Sixth Amended Complaint ¶ 28).

Plaintiffs allege that Star follows promotion practices based on subjective rather than objective job-related criteria. According to plaintiffs, these subjective criteria are not uniformly applied to African–American and Caucasian employees. At the heart of these allegations is Star's use of the PMP evaluations. PMPs provide the basis for determining in which pay grade an individual employee will be placed.

The written portion of the PMP is called the Performance and Development Review [PDR]. Under the PDR, Star evaluates employees by considering numerous subjective factors.[1] Plaintiffs claim that there are inadequate written policies and procedures at Star concerning the evaluation and promotion of employees. It is alleged that the criteria used in the PMP process changes frequently and subjects employees to varying standards. Moreover, it became evident at the certification hearing,

---

**1.** It is also alleged that Texaco sets these employment practices which are then adopted by Star.

that the appeal process in the PMP is not very effective. Plaintiffs claim that the whole process is used as a pretext for denying qualified African–American employees promotions and pay raises which they deserve. At the hearing, it was brought forth that each PMP includes a photograph of each employee. Thus, plaintiffs claim that Star's supervisors know who is African–American and who is not. In plaintiffs' view, this adds to the pretextual use of PMPs to discriminate against African–Americans.

Also at issue in this suit, is Star's use of word-of-mouth recruiting instead of a formal job posting system. Plaintiffs allege that this type of recruiting leads to discrimination since African–Americans are left out of the process.

## II. APPLICABLE LAW

Before beginning my analysis of the class certification issues, it is necessary to lay out the law applicable to this case.

### A. Title VII Claims

#### 1. Disparate Impact–Unintentional Discrimination

Title VII prohibits facially neutral policies which have a racially disparate impact whether or not there exists any racial animus. *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1523 (5th Cir.1993). In disparate impact cases, the plaintiffs must establish that the "respondent uses a particular employment practice that causes a disparate impact on the basis of race ... and the respondent [must fail] to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i). Thus, the plaintiffs bear the initial burden of demonstrating a disparate impact, and the burden then shifts to the employer to demonstrate the otherwise neutral policy was justified by business necessity. *Frazier*, 980 F.2d at 1525–26. Despite this shift of burden to the employer, the employees retain the ultimate burden of persuasion. *Id.* at 1525 n. 34.

In disparate impact cases, employees may seek only equitable relief and damages are only permitted so long as they are incidental to this relief. 42 U.S.C. § 2000e–5(g); 42 U.S.C. § 1981a(a)(1); *Allison v. Citgo*, 151 F.3d 402, 415 (5th Cir.1998) ("monetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief"). As a result, jury trials are not mandated and class actions are appropriate under 23(b)(2) as long as the other requirements of Rule 23(a) are met.

#### 2. Disparate Treatment–Pattern & Practice of Intentional Discrimination

Allegations of disparate treatment require proof of racial animus. *Id.* at 1526. Employees who allege disparate treatment initially bear the burden to present a prima facie case of discrimination. *Id.* Employees can achieve this by demonstrating that they applied for a job or promotion for which they were qualified, and were rejected "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If they are successful, the presumption is that the employer discriminated. *Id.* at 254, 101 S.Ct. 1089. The employer then must rebut this presumption by proffering a legitimate, nondiscriminatory reason for the business decision. *Id.* at 254–55, 101 S.Ct. 1089. The reason must be sufficient to raise a "genuine issue of fact." *Id.* The employees bear the ultimate burden of persuasion. *Id.* at 256, 101 S.Ct. 1089.

In disparate treatment cases, unlike disparate impact cases, employees are entitled to the full panoply of monetary damages and either party may demand a trial by jury. 42 U.S.C. § 1981(a)(c).

### B. Section 1981 Claim

Section 1981 provides equal contract rights under the law and prevents actions to interfere with these rights on

the basis of race. 42 U.S.C. § 1981. Courts have construed Section 1981 to include a remedy for employment discrimination on the basis of race. *Adams v. McDougal,* 695 F.2d 104, 108 (5th Cir. 1983). Actions under Section 1981 require proof of discriminatory intent. *General Building Contractors Assoc., Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

## III. STATUTE OF LIMITATIONS

### A. Time Period for the Class

Plaintiffs' proposed class purports to start in 1991. The defendants claim that the applicable statute of limitations has expired and the class cannot date all the way back to that time. Plaintiffs contend that the 1991 date is correct because the statute is tolled during the pendency of the earlier *Roberts* class action. The defendants, on the other hand, contend that the period is tolled only for individual lawsuits and not for subsequent class actions like the one sought here.

█ Case law makes it clear that if class certification is denied, the period of time between the beginning of the proposed class action and the denial is tolled for all putative class members and any subsequent individual lawsuits they may wish to bring. *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983); *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 552–53, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). Several circuits have limited these decisions with a "no piggyback rule" that restricts the tolling to subsequent individual lawsuits and not further class actions. *See, e.g., Basch v. Ground Round, Inc.,* 139 F.3d 6, 10–11 (1st Cir.1998); *Griffin v. Singletary,* 17 F.3d 356, 359–60 (11th Cir. 1994); *Andrews v. Orr,* 851 F.2d 146, 149–50 (6th Cir.1988); *Korwek v. Hunt,* 827 F.2d 874, 879 (2d Cir.1987); *Robbin v. Fluor Corp.,* 835 F.2d 213, 214 (9th Cir. 1987); *Salazar–Calderon v. Presidio Valley Farmers Ass'n.,* 765 F.2d 1334, 1351 (5th Cir.1985).

Plaintiffs argue that *Salazar–Calderon* does not stand for this proposition.[2] Plaintiffs argue that *Salazar–Calderon* was only an affirmation, on an abuse of discretion standard, of a district court's refusal to certify a class when there was a two year statute of limitations but the plaintiffs did not file their suit until four years after the cause of action arose. 765 F.2d at 1350–51 ("Although we affirm the district court's refusal to certify the class, we in no way restrict the court's discretion to change that decision on remand.").

Plaintiffs' contentions seem to conflict with the weight of authority. *See, e.g., In re Westinghouse Sec. Litig.,* 982 F.Supp. 1031, 1033–34 (W.D.Pa.1997) (interpreting *Salazar–Calderon* has holding that "the pendency of a previously filed class action does not toll the limitations period for additional class actions by the putative members of the original asserted class").

2. *Salazar–Calderon* revolved around a suit by farm workers against the growers who employed them in the 1977 harvest season for violations of the terms and conditions of their employment agreement. 765 F.2d at 1338–40. The original suit was filed as a class action in April 1979 by six class representatives on behalf of 809 other farm workers. The district court first denied class certification on March 30, 1981. *Id.* A short time thereafter, 251 would-be class members filed two new class actions which sought to represent the same class. This class was denied certification on February 2, 1982. On February 4, 1982, another 235 additional class members sought to intervene. This motion was denied and they filed yet another class action. All of the cases were consolidated, and the district court dismissed the 235 late filers. The court found that the late filers claims were barred by the applicable statute of limitations. On appeal, the Fifth Circuit affirmed the district court's ruling. The Fifth Circuit held that the rule tolling the statute of limitations for putative class members pending a decision on class certification operated only with respect to the first class certification petition filed. *Id.* at 1350–51. The court held that the rule does not continue through subsequent petitions in separately filed cases involving the same class. *Id.* Furthermore, putative class members could not "piggyback" one class action onto another and thus toll a statute of limitations indefinitely. *Id.*

However, this does not end the analysis. The corporate lines between Star and Texaco are very hard to determine, especially for an everyday employee at Star. Plaintiffs' proposed class was arguably contained in the initial proposed *Roberts* class, which was certified only for settlement purposes, which they in fact received. Plaintiffs claim they relied on the *Roberts* case to protect their interests. When it became apparent they were not part of that suit, they contacted counsel and brought this suit. *See* Affs. of Matthews Smith, Karen Love, John Comeaux, Darlene Green, Kenneth Ford, John Lumpkins, Cyrus Mehri (attorney in the *Roberts* class action).

■ *Salazar–Calderon* and cases like it show a concern about possible abuses of the *American Pipe* rule. As mentioned above, courts have been very reluctant to extend the "piggyback rule" of *American Pipe* to a second class action. The general rule is that the pendency of a previously filed class action does not toll the limitations period for later class actions by putative members of the original asserted class. *See Griffin v. Singletary,* 17 F.3d 356, 359 (11th Cir.1994). The Second Circuit explains the reasoning for the rule: "the Supreme Court ... certainly did not intend to afford plaintiffs the opportunity to argue and reargue the question of class certification by filing new but repetitive complaints." *Korwek,* 827 F.2d at 879. Case law makes it clear that once class certification has been denied, the pendency of the earlier filed class action does not toll the limitations period for additional class actions. *Id.*

■ This rationale does not apply to the present case. In this case, the plaintiffs, unlike many of the plaintiffs in the cited cases, are not simply bringing multiple class actions in scattered districts in an effort to find at least one district court willing to accept their class certification argument. *See generally, In re Crazy Eddie Securities Litigation,* 802 F.Supp. 804, 813 (E.D.N.Y.1992) (discussing how the plaintiffs in a second class action would have been unfairly prejudiced absent tolling). Here, the *Roberts* class action was settled prior to any substantive determination on class certification. The general rule, as expressed in *Griffin,* applies where a decision on the appropriateness of proceeding as a class has been decided, and the plaintiffs are prevented from "engag[ing] in endless rounds of litigation over the adequacy or propriety of proceeding as a class." 17 F.3d at 359. The named plaintiffs in this case are not attempting to certify a class which has already been denied certification by a court. *Lawrence v. Philip Morris Co. Inc.,* No. 94–CV–1494 JG, 1999 WL 51845 at *3 (E.D.N.Y. Jan.9, 1999) (recognizing that the plaintiffs were not attempting to "argue and reargue the question of class certification by filing new but repetitive complaints.") (*quoting Griffith,* 17 F.3d at 879). Rather, they are seeking to protect rights they legitimately thought were going to be part of the *Roberts* settlement.[3] Because the *Roberts* court never reached a definitive substantive decision on class certification, the general rule forbidding piggybacking does not apply here. *Carey v. Kerr–McGee Chem. Corp.,* 999 F.Supp. 1109, 1115 (N.D.Ill.1998). Thus, the court finds that the applicable class period begins in March of 1991.

3. Two of the named plaintiffs here, Matthews Smith and John Comeaux, had regular and sustained contact with the *Roberts* class counsel. In the *Roberts* plaintiffs' brief on class certification, it was argued that Star employees were part of the proposed class. Not until mid November of 1996, did either Smith or Comeaux learn that African–American Star employees would not be part of the *Roberts* class. The settlement class in *Roberts* states in pertinent part, "also for purposes of this Settlement, 'subsidiaries' shall mean entities in which Texaco, Inc. has, directly or indirectly, *more than 50% ownership interest.*" Notice of Pendency of Class Action, Proposed Settlement and Fairness Hearing, from the *Roberts* case. (emphasis added). Star employees were thus excluded since Texaco only has a 50% interest in Star and not a 50.01% interest.

■ Star has also argued that they were not a defendant in the *Roberts* suit so the statute of limitations cannot be tolled against them. Under Federal Rule of Civil Procedure 15(c)(3), an amendment of a pleading relates back to defendants not named in the original complaint so long as the party had notice of the suit within the limitation period and relation back would not be prejudicial. Star undoubtedly had notice of the *Roberts* class action. *See Carey*, 999 F.Supp. at 1112–14 (discussing how extensive media coverage should have alerted the plaintiffs to a potential cause of action); Eichenwald, *Texaco Executives, On Tape, Discussed an Impending Bias Suit*, THE NEW YORK TIMES, November 4, 1996. Furthermore, the court finds that the defendants will not be prejudiced by the relation back.[4]

### B. EEOC Charges

■ The defendants have also contended that certification of the plaintiffs' Title VII claims is improper because the plaintiffs allegedly did not file timely charges with the EEOC. Title VII requires aggrieved parties to file charges of discrimination with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e). Texas has its own state agency for civil rights complaints and is thus a "deferral state." Accordingly, the filing period is expanded to 300 days. *Blumberg v. HCA Management*, 848 F.2d 642, 645 (5th Cir.1988). Compliance with the 300–day charge filing period is not a prerequisite to federal subject matter jurisdiction. *Zipes v. Trans World Airlines*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). However, it is a statutory precondition to the maintenance of a Title VII action, and just like a statute of limitations, is subject to tolling for equitable reasons. *Id.*

■ The court finds that any deficiencies in plaintiffs' filing of EEOC charges are cured by equitable tolling. Plaintiffs Smith and Comeaux filed class-based charges of discrimination with the EEOC on December 10, 1996 and December 20, 1996. These charges would be untimely but for the fact that both of these plaintiffs believed that Star employees were going to be part of the *Roberts* class action. As discussed earlier, the limitations period is tolled for all potential class members until a decision on class certification is reached by the court. As soon as Smith and Comeaux learned that they were not part of the *Roberts* class, they filed their charges with the EEOC. Thus, the charges are deemed timely filed since the plaintiffs in this case relied on the earlier filing of the *Roberts* plaintiffs to protect their interests.

## IV. CLASS CERTIFICATION

Plaintiffs seek to certify a discrete known class of approximately 200 salaried African–American persons employed at Star Enterprise between March 23, 1991 and the present time. The plaintiffs have alleged that the defendants have engaged in both a pattern and practice of intentional discrimination against African–Americans and engaged in facially-neutral practices which have had a disparate impact on class members in violation of Title VII. *See* 42 U.S.C. § 2000e, *et. seq.*

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. The class must first satisfy the four threshold requirements of rule 23(a). Those requirements are: (1) numerosity (a "class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality ("named parties' claims or defenses are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect

---

4. At the certification hearing, evidence was brought forward that the *Roberts* settlement could not be implemented without the participation of Star. *See* Cert. Hearing Tran., P. 97, lines 9–12.

Moreover, the *Roberts* settlement involved many of the other defendants in this case. *See Roberts v. Texaco, Inc.*, 979 F.Supp. 185 (S.D.N.Y.1997) (detailing the settlement terms with Texaco and TRMI (east)).

the interest of the class"). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In addition, the class must satisfy one of the three subsections of Rule 23(b). *Id.* The party seeking class certification bears the burden of showing that all of the criteria is met. *See id.; Castano v. American Tobacco Co.,* 84 F.3d 734 (5th Cir.1996).

Here, the plaintiffs seek to be certified under both 23(b)(2) and 23(b)(3). Rule 23(b)(2) permits "class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.'" *Amchem,* 521 U.S. at 614, 117 S.Ct. 2231. The Supreme Court has recognized that a prime example of a rule 23(b)(2) class is a civil rights case "against parties charged with unlawful, class-based discrimination." *Id.* Thus, rule 23(b)(2) classes are appropriate where plaintiffs seek equitable relief.[5]

Rule 23(b)(3) classes, on the other hand, deal with legal relief. In order for a class to be certified under 23(b)(3) class claims must predominate over individual claims. *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 418–420 (5th Cir.1998). In addition, a class action must be a more efficient way of resolving the dispute. Rule 23(b)(3) provides:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions: (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirabil-

ity of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

■■■ While applying these principles, a district court is given wide discretion in deciding whether to certify a class. *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 624 (5th Cir.1999); *Allison,* 151 F.3d at 408; *McGrew v. Texas Bd. of Pardons & Paroles,* 47 F.3d 158, 162 (5th Cir.1995); *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 471–72 (5th Cir.1986). "A class may be certified if all four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met and one or more of the provisions of Rule 23(b) is satisfied." *Ahearn v. Fibreboard Corp.,* 162 F.R.D. 505, 523 (E.D.Tex.1995). As this court stated in *McClain v. Lufkin Indus.,* 187 F.R.D. 267, 277 (E.D.Tex. 1999), courts should not certify classes lightly. However, courts also should not err to the side of refusing certification at the early stages of litigation. "The opportunity to modify the certification or to decertify entirely provide ample opportunity to restructure the suit as discovery develops." *Id.* In this case, the parties have submitted voluminous briefs, extensive documentation and offered testimony in a hearing that spanned over three days. Having carefully considered all the evidence before it, the court concludes that the following class satisfies all elements of Rule 23(a), 23(b)(2) and 23(b)(3).

> All African–American employees of Star, at any time from March 23, 1991 to the present who have held or who have tried to obtain, a managerial, supervisory, or professional salaried position, and who have been, continue to be, or may in the future be adversely affected by Star's racially discriminatory employment and practices. The class does not include any hourly individuals who have tried to obtain salary positions.

Although courts must make "a rigorous analysis of the Rule 23 prerequisites be-

---

**5.** Equitable relief includes front pay and back pay. 42 U.S.C. § 2000e–5(g).

fore certifying a class," *Castano,* 84 F.3d 734, 740 (5th Cir.1996) (*citing General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)), the analysis is limited to that issue alone. *Garcia v. Gloor,* 618 F.2d 264 (5th Cir.1980). At this time, it is not appropriate for courts to examine the merits of a case. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Class certification is a procedural determination only. Applying these principles, the court will examine the class action prerequisites.

### A. Rule 23(a) Prerequisites

#### 1. *Numerosity*

██ As set forth in rule 23(a)(1), the numerosity prerequisite is met when "joinder of all members is impracticable." To meet the numerosity requirement, the exact number of potential members does not need to be established. *Celestine v. Citgo Petroleum Corp.,* 165 F.R.D. 463, 466 (W.D.La.1995), *aff'd,* 151 F.3d 402 (5th Cir. 1998). Other factors include "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1038 (5th Cir.1981); *Bradford v. Sears, Roebuck & Co.,* 673 F.2d 792, 795 (5th Cir.1982).

██ As recognized in *Lufkin Indus.,* employment discrimination suits that seek injunctive relief often are managed as class actions due to the difficulties with joinder. 187 F.R.D. at 278. Potential individual plaintiffs may refuse to identify themselves for fear of harassment or retaliation by the employer. *Mullen,* 186 F.3d at 624 (noting that employees "might be reluctant to file individually for fear of workplace retaliation"); *see* LINDEMANN AND GROSSMAN, EMPLOYMENT DISCRIMINATION LAW at 1607 (3d ed.1996) (citing cases).

Plaintiffs have asked this court to certify a class seeking injunctive and declaratory relief on behalf of all salaried African–American Star employees (approximately 200). The nature of this suit makes individual suits undesirable due to the danger of inconsistent results if the suits were tried individually. *See Baylor v. HUD,* 913 F.2d 223, 225 (5th Cir.1990) (acknowledging the fact that one of the primary purposes of the class action format is preventing piecemeal litigation). Even though African–American Star employees are a discrete and known class which are easy to ascertain, these 200 employees are located in various states throughout the union.[6] Thus, joinder is impracticable. *See* NEWBERG ON CLASS ACTIONS § 3.05, at 3–25 (3d ed.1992) (suggesting that any class consisting of more than forty members "should raise a presumption that joinder is impracticable"); *Moore Video Distribs., Inc. v. Quest Entertainment, Inc.,* 823 F.Supp. 1332, 1338 (S.D.Miss.1993) (noting that a class of seventy was sufficient to satisfy the rule). Accordingly, this court concludes the numerosity requirement is met.

#### 2. *Nexus Requirement*

The Supreme Court has recognized that the next three elements of 23(a) tend to overlap and intertwine. *Amchem,* 521 U.S. at 626 n. 20, 117 S.Ct. 2231 (1997). The elements of typicality, commonality, and adequacy of representation are collectively referred to as the "nexus requirement" of similarity between individual and shared claims. *Bradford,* 673 F.2d at 796. The commonality requirement of 23(a)(2) centers around the similarity of facts on which the claims rest. Typicality, 23(a)(3), focuses on the similarity of legal and remedial theories. The adequate representation criteria of 23(a)(4) instructs courts to make certain that the absent plaintiffs' interests are represented zealously by in-

---

**6.** The putative class members reside and work in Star's refineries in Port Arthur, Texas; Convent, Louisiana and Delaware City, Dela-

ware, as well as Star's administrative and marketing offices in Houston, Texas; Atlanta, Georgia and Richmond, Virginia.

dividuals who are free of interests which conflict with those of the class.

While each element is discussed separately, the facts supporting each element are relevant to the satisfaction of the others. Moreover, the standard for demonstrating commonality and typicality is not high. *Lightbourn v. County of El Paso,* 118 F.3d 421, 426 (5th Cir.1997); *Jenkins,* 782 F.2d at 472 ("[t]he threshold of commonality is not high").

### 3. *Commonality*

 Rule 23(a)(2) defines commonality in terms of whether there are questions of law or fact common to the class. "It is well established that the burden of demonstrating commonality under Rule 23(a)(2) is far less stringent than the commonality requirement of Rule 23(b)(3)." *Carter v. West Publ'g. Co.,* No. 97–2537–CIV–T–26A, 1999 WL 376502, at *5 (M.D.Fla. May 20, 1999) (*citing Amchem,* 521 U.S. 591, 117 S.Ct. 2231, 2243, 138 L.Ed.2d 689 (1997)). The Fifth Circuit has suggested that the following factors can assist courts in determining whether commonality exists or not:

In the context of litigation over alleged unlawful employment practices, relevant criteria of commonality include the following:

(i) What is the nature of the unlawful employment practice charged—is it one that peculiarly affects only one or a few employees or is it genuinely one having a class-wide impact [?]

(ii) How uniform or diverse are the relevant employment practices of the employer, considering matters such as: size of the work force; number of plants and installations involved; extent of diversity of employment conditions, occupations and work activities; degree of geographic dispersion of the employees and of intracompany employee transfers and interchanges; degree of decentralization of administration and supervision as opposed to the degree of local autonomy [?]

(iii) How uniform or diverse is the membership of the class, in terms of the likelihood that the members' treatment will involve common questions [?]

(iv) What is the nature of the employer's management organization as it relates to the degree of centralization and uniformity of relevant employment and personnel policies and practices [?]

(v) What is the length of the time span covered by the allegations, as it relates to the degree of probability that similar conditions prevailed throughout the period[?] (footnote omitted).

*Bradford v. Sears,* 673 F.2d 792, 796 n. 4 (5th Cir.1982) (adopting the analysis set forth in *Harriss v. Pan Am. World Airways,* 74 F.R.D. 24, 41 (N.D.Cal.1977)). In sum, the test for commonality is met "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn,* 118 F.3d at 426 (*citing Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1993)); *see also* Howard M. Downs, *Federal Class Actions: Due Process by Adequacy of Representation (Identity of Claims) and the Impact of General Telephone v. Falcon,* 54 Ohio St.L.J. 607, 637 (1993) ("So long as any common question links the representative and the class, the standard is met even though there are substantial divergent questions.").

#### a. *The Challenged Employment Practices are Widespread in their Impact*

Courts have recognized that as long as class members are allegedly affected by a defendant's general policy, and the general policy is the focus of the suit, the commonality prerequisite is satisfied. *Bowling v. Pfizer, Inc.,* 143 F.R.D. 141, 158 (S.D.Ohio 1992). Here, the plaintiffs have alleged, among other things, that Star's PMP program (Performance Management Program) and lack of official job postings has had a discriminatory impact on African–Americans. The PMP program is essentially a subjective evaluation tool used by Star in determining job performance. The

PMP evaluations are used in deciding who is eligible for job promotions and pay raises. The PMP program and lack of job postings impacts all class members and constitutes a barrier to the entire class. "Allegations of similar discriminatory employment practices, such as the use of entirely subjective personnel processes that operate to discriminate, satisfy the commonality and typicality requirements of Rule 23(a)." *Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 617 (5th Cir.1983). These allegations demonstrate employment practices which could have a potential class wide impact.[7]

### b. Diversity of Relevant Employment Practices

In *Lufkin Indus.*, this court pointed out that the second indicia of commonality concerns the homogeneity of the challenged employment practices. 187 F.R.D. at 280. Relevant factors which assess the likelihood of a class being similarly affected by the challenged employment practices include: the size of the workforce, number of plants, variety of employment conditions, geographic location, and the degree of local autonomy. *Id.*

There are only 200 members of the potential class. The class is strictly limited to African–American salaried employees. Pay grades, promotions, and evaluations all are determined by the subjective PMP decision making process. The plaintiffs have alleged that African–Americans have failed to be promoted in part due to the lack of a formal job posting system. The discretion involved in the promotion process is the focus of plaintiffs' disparate impact claim. Defendants have argued that the discretion involved in the promotion process is not suitable for class adjudication because the suit will "degenerate into an endless parade of individual discrimination claims." *See* Texaco's Resp. to Cert. at 14.

Star Enterprises is located in primarily six locations. *See* n. 6 *supra.* The Human

Resources department is centrally located in Houston, Texas. Star is structured and administrated in such a way that the challenged employment practices are likely to affect all class members similarly. Given the fact that the class members are affected by the same general policies, and that these policies are the focus of this suit, the court finds the commonality requirement has been satisfied. *See Jenkins*, 782 F.2d at 472 (noting that the threshold for commonality is not high); 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1763 (1986 and supp.) (class actions seeking equitable relief often by their very nature present common questions fulfilling commonality requirement except when propriety of relief "turns on the individual circumstances of each class member or the defendant has not engaged in a common course of conduct toward them").

### c. Diversity of Class

The class of plaintiffs in this case is limited to salaried African–American employees of Star. The class does not include multiple ethnicities, or address claims of age or gender discrimination. The basis of the alleged discrimination is limited strictly to race. The class members are all similarly situated with respect to the employment practices which are the subject of this suit. Thus, the class is not so diverse as to preclude certification under the commonality prong of Rule 23(a).

### d. Uniformity of Relevant Employment Practices

The fourth indicia of commonality relates to the centralization of Star's management organization with respect to the challenged employment practices. In this case, all of the potential class members were subject to the PMP evaluations. Each PMP evaluation involves a subjective decision making process. This process is at the very heart of this suit. The PMPs

---

**7.** Again, the court notes that this opinion is strictly limited to class certification issues. I

make no judgment on the merits of the allegations.

are conducted separately by each department but they affect the pay grade in which an individual employee will be placed. Thus, the challenged employment practices affect each area of Star similarly.

### e. Time Span of the Challenged Practices

The issue under this factor is the likelihood that the employment practices remained consistent throughout the period of the alleged discrimination. The class here is limited to those who can show injury since 1991. The PMP process has been in effect since Star was formed. The court finds that the employment conditions have been considerably the same over this period of time.

There is ample evidence in the record indicating a commonality of question of facts and law among members of the class. The typicality analysis discussed below demonstrates other similarly shared legal issues.

### 3. Typicality

■ Rule 23(a)(3) defines typicality as whether the claims or defenses of the representative parties are typical of the claims or defenses of the class as a whole. Simply put, the court must examine whether the named plaintiffs are typical of the class. Courts have held that allegations of subjective employment practices that operate in a discriminatory fashion generally satisfy the typicality requirement of 23(a). *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir.1993); *see also Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir.1997). The typicality requirement, like the commonality requirement, is not demanding. *Mullen*, 186 F.3d at 625; *Forbush*, 994 F.2d at 1106; *Shipes*, 987 F.2d at 316; *Celestine*, 165 F.R.D. at 467.

The named plaintiffs in this case do not assert claims unique to themselves. On the contrary, the representative parties allegedly have been adversely affected by the same policies, practices and procedures as the absent class members. Witnesses testified during a hearing of the discriminatory impact Star's employment practices have had on African–Americans.. The court allowed the plaintiffs to supplement the record with statistical data substantiating these claims.[8] Because this suit centers around a challenge to subjective policies which are claimed to be discriminatory, rather than a redetermination of each class member's individual claim, any difference in facts concerning individual plaintiff's alleged injuries is of no consequence. *San Antonio Hispanic Police Officers' Org. v. City of San Antonio*, 188 F.R.D. 433, 443 (W.D.Tex.1999). In this case, the named plaintiffs' and the proposed class members' legal and remedial theories appear to be exactly the same. *See Lightbourn*, 118 F.3d at 426 (noting that the typicality requirement "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent"); *Walton v. Franklin Collection Agency, Inc.*, 190 F.R.D. 404, 409 (N.D.Miss.2000) ("a claim by a representative plaintiff may be deemed typical if it is one which members of the proposed class should reasonably be expected to raise"). Accordingly, the typicality standard has been met.

### 4. Adequacy of Representation

Rule 23(a)(4) requires the class representatives and their counsel to "fairly and adequately protect the interests of the class." Two elements must be met to satisfy this requirement: (1) concerns regarding the qualifications of counsel, and (2) concerns regarding "the relationship between the interests of the class representative and the interests of other class members." *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 524 (E.D.Tex.1995) (quoting *Jenkins v. Raymark Indus., Inc.*, 109

---

**8.** Defendants have submitted their own statistics attacking plaintiffs' expert's conclusions. However, the court again notes that now is

not the appropriate time to weigh the merits of each parties case. *Eisen*, 417 U.S. at 176–78, 94 S.Ct. 2140.

F.R.D. 269, 273 (E.D.Tex.1985), *aff'd*, 782 F.2d 468 (5th Cir.1986)).

#### a. Qualifications of Counsel

Plaintiffs' counsel, James Payne, is a practitioner who is well known to this court. He has represented numerous clients in racial discrimination cases. Mr. Payne is a member of Provost ★ Umphrey law firm. Provost ★ Umphrey has submitted affidavits to this court demonstrating their commitment to this case. The firm has a strong national reputation for excellence in class actions and undoubtedly has the resources to pursue this suit.

The defendants do not contest plaintiffs' counsels' qualifications. They do, however, dispute the fact that plaintiffs' counsel is suitable for representing the class in this case. The defendants base their argument on the fact that plaintiffs' counsel did not attempt to intervene in the *Roberts* settlement. The court disagrees. Plaintiffs' counsel has zealously represented his clients in every facet of *this* case. The court is confident that the potential class members' rights will be adequately protected by Mr. Payne and his co-counsel.

#### b. Class Representatives

The second element concerning adequacy of representation concerns the class representatives. This element is satisfied if the class members' "interests are sufficiently aligned with those of other class members." *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 273 (E.D.Tex.1985), *aff'd*, 782 F.2d 468 (5th Cir.1986). This element requires similarity, not identity of interests. *Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 617 (5th Cir. 1983). The court finds that the named plaintiffs adequately represent the class.

■ The court concludes that the named plaintiffs have common interests with the class members, lack interests adverse to the class, and have vigorously pursued the interests of the class through qualified counsel. *See East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). The named plaintiffs are a group of management leaders all employed by the defendant. The defendants contend that the named plaintiffs should not serve as class representatives because some of them have unique educational backgrounds or are supervisors for other members of the class. The fact that each individual plaintiff has had unique experiences while at Star does not mean that the named plaintiffs are unsuitable as class representatives. *Lufkin Indus.*, 187 F.R.D. at 281. The court cannot find any antagonistic interests between class members and their representatives. *Ahearn*, 162 F.R.D. at 525 ("[c]lass representatives satisfy the requirement unless they have 'an insufficient stake in the outcome or interest antagonistic to the unnamed members' ") (*quoting Jenkins*, 782 F.2d at 472). The class representatives and the members of the class are affected in similar ways by the alleged discrimination by Star. If the allegations are true, then all members of the class have been denied promotions and pay raises based on race. There is nothing in the interests of the class representatives that is contrary to interests of the class in this regard.

I note that I have continuing authority and the ongoing obligation to adjust the class representatives to serve the interests of the class members if it becomes necessary. At this point, however, there is nothing in the record to indicate that the named plaintiffs will not adequately represent this class.[9]

I, therefore, conclude that the plaintiffs have met all the requirements of Rule

---

**9.** The Fifth Circuit has recognized that a district court may reevaluate a class and the adequacy of representation in light of evidence adduced at trial. *Carpenter*, 706 F.2d at 617 (*citing Guerine v. J & W Investment, Inc.*, 544 F.2d 863, 864 (5th Cir.1977)). If it is determined that the named plaintiffs are not adequate representatives, "the appropriate step is appointment of new representatives from the existing class, not decertification." *Id.* (*citing Satterwhite v. City of Greenville*, 634 F.2d 231 (5th Cir.1981) (en banc)).

23(a). I must then consider whether the plaintiffs can meet any of the requirements of Rule 23(b).

### B. Requirements of Rule 23(b)

In this case, the plaintiffs have moved for class certification of their claims under both 23(b)(2) and 23(b)(3). The plaintiffs seek to have their equitable claims certified under 23(b)(2) and their claims for legal relief, compensatory and punitive damages, certified under 23(b)(3).

### 1. 23(b)(2)—Injunctive Relief

■ Under Rule 23(b)(2) the plaintiffs must show that, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED.R.CIV.PRO. 23(b)(2). Civil rights cases, such as this one, alleging class-based discrimination are classic examples of cases suitable for certification under 23(b)(2). *Amchem*, 521 U.S. at 614, 117 S.Ct. 2231 (*citing* Adv.Comm. Notes, 28 U.S.C.App., p. 697).

■ In order for a class to be certified under 23(b)(2), the claims for injunctive relief must predominate. *Allison v. Citgo*, 151 F.3d 402 (5th Cir.1998). Monetary relief can be awarded in these suits so long as it is not the predominant form of relief. *Id.* at 414–15. "Monetary relief 'predominates' under Rule 23(b)(2) . . . when the monetary relief being sought is less of a group remedy and instead depends more on the varying circumstances and merits of each potential class member's case." *Id.* at 413.

Defendants have vigorously contended certification in this case under 23(b)(2) because the plaintiffs have requested both compensatory and punitive damages. In *Allison*, the Fifth Circuit held that based on the facts of that case compensatory and punitive damages were inconsistent with the structure of 23(b)(2) classes. *Id.*

This court would be more concerned if plaintiffs' counsel did not request compensatory and punitive damages. At least one district court in this circuit has held that a class representatives's decision not to bring a claim for money damages prevented class certification. *Zachery v. Texaco Exploration & Prod., Inc.*, 185 F.R.D. 230, 244 (W.D.Tex.1999). In *Zachery*, Judge Furgeson reasoned that if class representatives did not bring claims for money damages then there was a potential conflict with putative class members whose rights would not be adequately protected. *Id.* The unnamed class members could potentially lose their rights to bring claims asking for money damages in the posture of that case. *Id.* Since plaintiffs here asked for money damages, that potential problem is not presently before this court.

The issue before this court is whether the claims for money damages prevent certification under 23(b)(2). The defendants contend that it does. The defendants in this case have fought every single element of class certification tooth and nail. The defendants are trying to force the class representatives into a *Catch–22*. If the representatives did not ask for money damages, surely the defendants could well have argued that they were not adequate class representatives.[10] Because the representatives did ask for money damages, the defendants now contend that certification is impermissible for this reason alone.

The court disagrees. Although the requested money damages in this case are not incidental to the claims for injunctive relief, this does not mean that the court cannot certify the equitable claims only under 23(b)(2). *See Allison*, 151 F.3d at 423–25 (discussing how it is impermissible for equitable claims to be tried to a court before a decision on certifying legal claims has taken place); *Jefferson v. Ingersoll Int'l*, 195 F.3d 894, 899 (7th Cir.1999) (discussing how a court can bifurcate the proceedings and certify a 23(b)(2) class for

---

10. And probably would have done so because the same lead counsel for the Texaco entities in *Zachery* is the lead counsel for the same Texaco entities here.

equitable relief and a 23(b)(3) class for damages). It is entirely permissible for a court to certify the equitable claims of a class under 23(b)(2) as long as the Seventh Amendment is not violated. *Allison,* 151 F.3d at 423.

The Seventh Amendment will not be violated in this case because all claims will be tried to a jury before any final court determination of the equitable claims is made. *Id.* (*citing Roscello v. Southwest Airlines Co.,* 726 F.2d 217, 221 (5th Cir. 1984)) ("When claims involving both legal and equitable rights are properly joined in a single case, the Seventh Amendment requires that all factual issues common to these claims be submitted to a jury for decision on the legal claims before final court determination of the equitable claims."). In the plaintiffs' disparate impact claim, they have alleged that the defendants' facially neutral employment policies demonstrate a statistically significant pattern of discrimination rather than a chance occurrence. If the plaintiffs' allegations are true, then there can be no doubt that the defendants have acted "on grounds generally applicable to the class." Therefore, the plaintiffs' claims for injunctive relief are hereby certified under 23(b)(2), and persons who do not wish to join with the representative plaintiffs will have an opportunity to opt out after each member of the known discrete class is notified.

### 2. 23(b)(3)—Claims for Legal Relief

In order for a class to be certified under 23(b)(3), two requirements must be met. First, "questions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members." FED.R.CIV.PRO. 23(b)(3). "In order to 'predominate' common issues must constitute a significant part of the individual cases." *Jenkins,* 782 F.2d at 472. Second, a class action must be "superior" to other available methods for the fair and efficient adjudication of the controversy. *Washington v. CSC Credit Servs., Inc.,* No. 98–31209, 2000 WL 590 at

\* 1 (5th Cir. Jan.7, 2000) (*citing Mullen,* 186 F.3d at 623–24).

#### a. Predominance

The predominance requirement of Rule 23(b)(3) is "far more demanding than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir.1997) (*quoting Amchem,* 521 U.S. at 624, 117 S.Ct. 2231). The Fifth Circuit, in *Allison,* recognized that Rule 23(b)(3) is the "appropriate means of class certification when monetary relief is the predominant form of relief sought and the monetary interests of class members require enhanced procedural safeguards." 151 F.3d at 413.

In *Allison,* the plaintiffs argued that the "common, overarching issue regarding the existence of plant-wide racially discriminatory practices or policies" justified certification under Rule 23(b)(3). *Id.* at 420. Some of the specific practices complained of in that case were: failure to post or announce job vacancies, use of word-of-mouth publication, use of tests to evaluate potential candidates, and subjective decisionmaking process by a predominantly white supervisory staff in reviewing applicants. *Id.*

The *Allison* court found no abuse of discretion in the district court's decision denying class certification under Rule 23(b)(3) because the "plaintiffs' claims for compensatory and punitive damages ... would turn ultimately on special circumstances of each individual's case." *Id.* at 420. The court also noted that the plaintiffs' claims for money damages "focus almost entirely on facts and issues specific to individuals rather than the class as a whole: what kind of discrimination was each plaintiff subjected to; how did it affect each plaintiff emotionally and physically, at work and at home; what medical treatment did each plaintiff receive and at what expense; and so on and so on." *Id.* at 419.

Here, the plaintiffs have complained of many of the same policies that were at

issue in *Allison.* The plaintiffs claim that discrimination exists in: the lack of job posting, word-of-mouth recruiting, and the subjective PMP process which is conducted by an almost all white supervisory staff.

In this case, there are many issues which are common to the class. Namely, whether the defendants engage in specific policies and procedures which constitute a pattern and practice of discrimination that adversely affects African–American salaried employees. Unlike the plaintiffs in *Allison,* the plaintiffs here are a much more homogenous group who have suffered similar damages.

All of the plaintiffs here are salaried employees none of whom belong to a union. In *Allison,* the hourly employees were members of six different unions. In *Allison,* the class was defined way more broadly than the one proposed here. For example, the potential class in *Allison* contained all current and former employees *and applicants for positions.* The class here consists only of those individuals who *have worked* for Star in a salaried position. All of Star's employment decisions are purported to be made at their Headquarters in Houston, Texas. Furthermore, there are only 200 plaintiffs in this case compared to the 1000 potential members in *Allison.* All of these factors demonstrate why common issues predominate over any questions affecting only individual members.

The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Discrimination cases are generally well-suited for class actions, as the alleged discrimination is often by its very nature class-based with classwide injuries and common legal and factual issues. *East Texas Motor Freight Sys. Inc. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

Courts have long recognized that "[t]he whole purpose of certifying a class action is to limit and hopefully avoid repetitive individual determinations of the Defendant's common practices and courses of conduct." *Walton v. Franklin Collection Agency, Inc.,* 190 F.R.D. 404, 411–12 (N.D.Miss.2000) (*quoting Mays v. National Bank of Commerce,* No. 1:96cv8–D–D, 1998 WL 930627, *14 (N.D.Miss. Nov. 20, 1998).) In this case, common questions will focus on whether or not Star engages in a pattern or practice of intentional discrimination through their various employment policies.

The defendants contest certification on the theory that they are too many individual damage issues. But this problem is easily avoided. If it becomes apparent that there are significant differences in damages between the members of the class here, the court can with the aid of counsel fashion appropriate subclasses to alleviate the problem. *See Allison,* 151 F.3d at 420 n. 15 ("Without any help from the plaintiffs, the district court certainly did not abuse its discretion in not attempting to devise a workable subclassing plan of its own."); Note, *Certifying Classes and Subclasses in Title VII Suits,* 99 HARV. L.REV. 619, 634–36 (1986) (stating "a court that uses subclasses responds to, rather than ignores, the panoply of interests within a large class").

The defendants have all contended that *Allison* prevents this class from being certified. This is simply not so. *Allison* was primarily concerned with detailing the changes the Civil Rights Act of 1991 has had on class actions. There is nothing in *Allison* that indicates that the class action device can no longer be used in racial discrimination cases. On the contrary, the *Allison* court made repeated references to how district judges are in the best position to decide whether all the requirements of Rule 23 have been met. 151 F.3d at 408, 416, 425.

*Allison* did not hold that the district court could not fashion a satisfactory method for disposing of the questions presented in a class action which included both injunctive relief under Rule 23(b)(2)

and also claims for legal relief under 23(b)(3). Rather, it held the district court did not abuse its discretion in failing to certify a class in view of the 1991 amendments to the discrimination statute. 42 U.S.C. § 2000e, *et seq.* This was especially true because the district court had invited solutions, and the plaintiffs' attorneys gave no help or suggestions to the court.

Racial discrimination has long been present in all parts of this country, including the work place. The courts, the Congress and the Executive Branch have often attempted to eradicate discrimination in all forms. To do so is a worthy goal. When the Congress amended the statute in 1991, it attempted to permit more than front pay and back pay to be available to those who had been subjected to such practices, and to submit their cases to a jury, not merely a judge. In attempting to broaden the remedy, hopefully it tried to deter those who practiced discrimination, especially on a wholesale basis, and to lessen such practices. However, as it now appears, it created a Hobson's choice for prospective groups who may have been subjected to such racial animus, especially if the employer directed or permitted such activity toward a large enough group that only individuals could bring solo lawsuits. Here, there are 200 in the purported class compared to *Allison's* 1000. If these 200 claims are required to be tried on a single shot basis, different results are almost a certainty. But what is an absolute certainty is that this one district court will be totally and fully occupied for the larger part of at least 200 weeks in the trial of these claims alone.

Simply because *Allison* held it was not an abuse of the district court's discretion to refuse to fashion a method of proceeding under Rule 23(b)(2) or 23(b)(3) does not necessarily forbid a district court from attempting to dispose of these claims in a fair, orderly manner, while affording parties their full rights under the expanded statute.

Moreover, there is nothing in either the plain language or the legislative history of the Civil Rights Act of 1991 that Congress intended those amendments to preclude class actions in racial discrimination cases. The Civil Rights Act of 1991 was enacted to eradicate discrimination—not to present barriers to individuals who are attempting to have their rights protected. There is absolutely no authority suggesting the Civil Rights Act of 1991 ended class actions in racial discrimination suits. To suggest otherwise turns *Allison* and the Civil Rights Act of 1991 on its head. Class actions are still permitted in racial discrimination cases when there are claims for money damages as long as all the requirements of 23(b) are met. The requirements of 23(b) are met when the class is one as discrete and homogenous as the one found here.[11]

The Seventh Circuit is in agreement with this analysis. *See Ingersoll,* 195 F.3d at 897–98. In *Ingersoll,* Judge Easterbrook states that *Allison* recognizes the possibility of split class certification under 23(b)(2) and (b)(3). *Id.* The Seventh Circuit maintained that "[i]t is possible to certify the injunctive aspects of the suit under Rule 23(b)(2) and the damages aspects under Rule 23(b)(3), achieving both consistent treatment of class-wide equitable relief and an opportunity for each affected person to exercise control over the damages aspects." *Id. (citing Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79

---

**11.** Additional support for certifying classes such as the present can be found in the *Roberts* case. The court there found no problem in ratifying the settlement for the proposed class. *Roberts v. Texaco,* 979 F.Supp. 185 (S.D.N.Y.1997); *see also Warnell v. Ford Motor Co.,* 189 F.R.D. 383 (N.D.Ill.1999) (certifying a Title VII class action); *Carter v. West Publ'g Co.,* No. 97–2537–CIV–T–26A, 1999 WL 376502 at * 15 (M.D.Fla. May 20, 1999) ("even after the 1991 Amendments to the Civil Rights Act, this Court finds it difficult to imagine that a bright-line rule applies to deny a district court the discretion to grant class certification under Rule 23(b)(3) in every Title VII case in which the plaintiffs seek compensatory and punitive damages and a jury trial.").

S.Ct. 948, 3 L.Ed.2d 988 (1959) and *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962)).[12] This is exactly what will be done in the case *sub judice.*

### b. Superiority

■ The second and final element under Rule 23(b)(3) requires that the party seeking class certification demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R.CIV.PRO. 23(b)(3).

The court notes that joinder is not possible since the plaintiffs reside in a number of states. *See* Numerosity discussion *supra.* Likewise, individual actions would take up far more judicial resources than a single class. *See* Predominance Discussion *supra.* The court therefore finds that a class action is a superior means for managing this case because of the efficiencies involved in addressing the claims of about 200 class persons.

The court cannot look forward to repeated adjudication of racial discrimination claims brought by each of the individual plaintiffs. The court concludes without reservation that a class action is superior to other methods of adjudication. The court is convinced that individual actions by the various employees would produce considerable duplication of effort, increase the cost of litigation and consume judicial resources through repetition.

More importantly, the class action will permit adjudication of possibly meritorious claims which otherwise might not be brought on behalf of African–American salaried employees who are unable or unwilling to sue their employer, a frightening task even for a brave employee. As mentioned earlier, any management problems that arise can be solved by the use of subclasses.

In summary, the court holds that certification of the proposed class will satisfy this element of Rule 23(b)(3). Class certification will safeguard judicial economy by limiting duplicative litigation, and the plaintiffs will ensure uniform results for any absent class members.

## V. CONCLUSION

After careful and detailed review of the entire record, the court is persuaded that the plaintiffs have met their burden of establishing all the necessary requirements of Rule 23(a), 23(b)(2), and 23(b)(3). There is nothing in the language of the Civil Rights Act of 1991 which prevents courts from certifying Title VII classes under 23(b)(2) and 23(b)(3). In *Allison,* the Fifth Circuit set heavy burdens for plaintiffs to meet in trying to certify class actions under 23(b)(3). The plaintiffs in this case meet each one of *Allison's* predominance requirements. The court will enter an appropriate order requiring notification of all Star's salaried African–American employees and permit those who wish to opt out of either the 23(b)(2) or 23(b)(3) class certification the opportunity to do so. Therefore, the plaintiffs' Motion for Class Certification under both 23(b)(2) and 23(b)(3) is GRANTED.

---

**12.** The Seventh Circuit also recognized that this is the equivalent of treating a Rule 23(b)(2) class as a 23(b)(3) one. This allows for notice and an opportunity to opt out.